**Marilyn BRUNO, Appellant,**

v.

**WESTERN UNION FINANCIAL SERVICES, INC., Apex–Petroleum Corporation, and First Data Corporation, Appellees.**

**No. 06–CV–64.**

District of Columbia Court of Appeals.

Argued May 23, 2007.
Decided June 18, 2009.

Salvatore J. Zambri, with whom Patrick M. Regan and Paul J. Cornoni, was on the brief, Washington, for appellant.

Samuel N. Shapiro, with whom Jeffrey R. Schmieler, was on the brief, for appellees Western Union Financial Services, Inc. and First Data Corporation.

Ronald W. Cox, Jr., was on the brief, for appellee Apex–Petroleum Corporation.

Before KRAMER and FISHER, Associate Judges, and BELSON, Senior Judge.

PER CURIAM:

Appellant, Marilyn Bruno, sustained serious injuries during a robbery inside appellee Apex Petroleum's gas station, and thereafter sued Apex, Western Union, and First Data Corp. for negligence.[1] The trial court granted the motions of Western Union and First Data for summary judgment, and subsequently granted appellee Apex's renewed motion for summary judgment. Appellant now appeals these decisions, arguing that the trial court erred by finding that the assault that caused her injuries was not foreseeable and ruling that Apex was not the actual or apparent agent of Western Union. We affirm.

### I.

In this case, we are confronted with the consequences of a violent crime. The appellant suffered serious physical and psychological injuries in a vicious robbery. At her deposition, appellant gave a detailed account of the events leading to her injuries, which we accept as accurate for the purposes of this appeal. On June 13, 2000, appellant went to a gas station owned by Apex at 2830 Sherman Avenue in Northwest Washington, D.C., to send money via a Western Union Wire transfer to her daughter, who was in urgent need of money. Appellant had initially called Western Union and asked if she could perform the transfer over the telephone with a credit card; she was told that the transfer could be made only by reporting to a Western Union service center with cash in hand. The Western Union telephone representative first directed appellant to a video store located one street away from appellant's residence in the Logan Circle area of Washington, D.C.[2] Appellant called the video store and found that it was closed. She therefore called Western Union again and was referred to Apex's gas station on Sherman Avenue. According to appellant's deposition testimony:

> And this time I was put on hold while the Western Union woman called that station, got back on with me and said, Olu is waiting for you. He can give you directions on how to get there. He's waiting for your call. Here's his name and number.

Appellant next called and confirmed with Olu Ogundimu, an employee of Apex, that the station was open and that he would be able to process the $700 transfer to her daughter.

■ Appellant arrived at Apex at approximately 9:30 p.m. and immediately identified herself to the Apex employees who were on duty behind a plexiglass window.[3] Despite appellant's earlier conver-

---

1. Appellant's complaint contains three substantive counts against each named defendant: (1) failure to provide reasonable and necessary security measures; (2) negligent failure to warn; and (3) gross negligence. She also sought punitive damages from each appellee for willful and wanton conduct.

2. At the time of the attack, appellant lived on 13th Street, N.W., between N and O Streets.

3. The Apex gas station is located within two miles of where appellant lived at the time of the attacks. " 'Judicial notice may be taken at any time, including on appeal.' " *Robert Siegel, Inc. v. District of Columbia*, 892 A.2d 387, 395 n. 11 (D.C.2006) (quoting *United States v. Burch*, 169 F.3d 666, 671 (10th Cir. 1999)). " 'A judicially noticed fact must be one not subject to reasonable dispute in that it

sation with Ogundimu, he did not have the forms ready when she arrived and took some ten minutes to find them. As appellant continued to wait, she noticed a person in the corner of the store, twelve to fifteen feet away, staring fixedly at her. While she felt "[v]ery concerned" about her safety, she did not bring it to the attention of the two Apex employees in the enclosure because she thought it would be "impolite" and because she "was trying to be very inconspicuous and hope[d] that this was going to be over soon." She also noted that Olu "fanned out [the] seven hundred dollar bills" she gave him while "looking over at this guy in the corner." Although she was becoming increasingly uneasy, appellant "didn't want to be confrontational in any way with anybody.... [She] did not want to provoke."

During this time, appellant had her brief case over her shoulder, but had twisted the strap around her arm. Approximately fifteen minutes after she entered the store, with Ogundimu still processing her transfer, appellant felt someone grab her bag with such force that she was flung against a cement wall. Appellant screamed and implored bystanders, who included Ogundimu and another employee, to help her, but no one intervened. While appellant was willing to give the bag to her attacker, she could not extricate herself from the strap. Finally, the strap on the bag broke, and the assailant escaped through the door. In the meantime, Ogundimu had called 911, and police and EMS arrived on the scene. Despite her injuries, appellant would not leave for the emergency room until she received a receipt indicating that the funds had been successfully transferred, a process that took until 11:30 p.m. To date, the assailant has not been identified or apprehended.

Appellant testified at a deposition about the extent of the injuries she sustained in the assault. The fingertip on the middle finger of her right hand was "ripped off ... about half an inch, three quarters of an inch down," and was "ultimately stitched back on." She also suffered extensive lacerations to her left arm where she had been holding her briefcase, a broken front tooth, and neck injuries. In addition, both of appellant's eyes were injured in the attack and as a result, she suffered from frequent headaches, visual deficiencies, vertigo, and repeated surgeries. She described the injuries to her eyes "as a major, major life-changing problem." After the attack, appellant experienced nightmares, nervousness, and "acute fear," and she has been diagnosed with post-traumatic stress disorder. Appellant also testified that her career as a Foreign Service Officer with the Department of State has suffered as a result of the attack because she has not been "functioning at peak performance." Following discovery, Western Union and First Data[4] filed a motion for summary judgment, asserting that no material facts refuted their claim that Apex was not First Data or Western Union's agent and that even if such an

---

is either (1) generally known within the territorial jurisdiction of the trial court, or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.' " *Id.* (quoting FED. R.EVID. 201(b)). Based upon reference to various maps and the court's familiarity with the area, appellant had to drive approximately 1.2 miles north on 13th Street and then an additional two blocks east on Harvard Street before arriving at the gas station. *See Gordon v.*

*Lewistown Hosp.,* 272 F.Supp.2d 393, 429 n. 34 (M.D.Pa.2003) (taking judicial notice of driving distances).

4. According to appellant's complaint, First Data "is the parent corporation and/or corporate successor of Defendant Western Union, and Defendant Western Union is a subsidiary of First Data."

agency relationship existed, appellant could not recover because appellant's injuries were caused by the criminal act of a third party that was not foreseeable to the defendants. Apex then filed its own summary judgment motion based on the unforeseeability of the third-party robbery and assault. The trial court granted summary judgment in favor of Western Union and First Data, ruling that no agency relationship existed between Western Union and Apex and that the assault by a third party was not foreseeable to Western Union and First Data. However, the trial court did not immediately grant Apex's summary judgment motion, but it gave appellant additional time to obtain documentation from the Metropolitan Police Department regarding Apex's ability to foresee the incident. The deadline for appellant to supplement her opposition to the motion passed without any additional filings, and on December 15, 2005, the trial court granted Apex's motion for summary judgment.

## II.

On appeal, Ms. Bruno argues: (1) the trial court erred in granting summary judgment in appellees' favor because the criminal assault she suffered was foreseeable to appellees, and (2) a principal-agent relationship exists between Western Union and Apex Petroleum, and Western Union is vicariously liable for the negligence of Apex, its agent. We affirm the trial court's grant of summary judgment in favor of appellees on the issue of foreseeability, and as a result, we do not reach appellant's second argument.

### A. *Standard of Review*

"In reviewing a trial court order granting a summary judgment motion, we conduct an independent review of the record, and our standard of review is the same as the trial court's standard in considering the motion for summary judgment." *Critchell v. Critchell,* 746 A.2d 282, 284 (D.C.2000). That is:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.

Super. Ct. Civ. R. 56(c). "[O]ne who moves for summary judgment has the burden of demonstrating clearly the absence of any genuine issue of fact, and any doubt as to the existence of such an issue is resolved against the movant." *Doolin v. Environmental Power Ltd.,* 360 A.2d 493, 496 (D.C.1976) (internal quotation marks, ellipses, and citations omitted). "Once this showing has been made, the burden shifts to the non-moving party to show the existence of an issue of material fact." *Landow v. Georgetown–Inland West Corp.,* 454 A.2d 310, 313 (D.C.1982). The non-moving party may not avoid summary judgment merely with conclusory allegations; rather he or she "must produce at least enough evidence to make out a prima facie case in support of his [or her] position." *Joeckel v. Disabled Am. Veterans,* 793 A.2d 1279, 1281–82 (D.C.2002); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Thus, "[a] plaintiff opposing a defense motion for summary judgment, in order to make the evidentiary showing that will permit him [or her] to advance to trial must show that he [or she] has a plausible ground for the maintenance of the cause of action." *Nader v. de Toledano,* 408 A.2d 31, 48 (D.C. 1979) (internal quotation marks and citations omitted).

B. *Foreseeability of the Criminal Assault*

To prevail in a negligence cause of action, a plaintiff must prove " 'the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury.' " *Evans–Reid v. District of Columbia*, 930 A.2d 930, 937 n. 6 (D.C.2007) (internal citation omitted). Where a plaintiff suffers injury due to an intervening criminal act committed by a third party, "the requisite duty of care required for negligence is a function of foreseeability[.]" *District of Columbia v. Beretta, U.S.A., Corp.*, 872 A.2d 633, 641 (D.C.2005) (en banc). Appellant argues that a genuine issue of material fact remains "as to whether Appellees could have foreseen the danger to Ms. Bruno and other business invitees and taken reasonable steps to prevent that danger." In support of this argument, appellant relies upon *Viands v. Safeway Stores, Inc.*, 107 A.2d 118 (D.C.1954).[5] We cannot agree with Ms. Bruno that the trial court erred in granting summary judgment on the issue of foreseeability.

When a plaintiff is injured by an intervening criminal act of a third party, liability is dependent " 'upon a more heightened showing of foreseeability than would be required if the act were merely negligent.' " *Beretta, supra*, 872 A.2d at 641 (quoting *Potts v. District of Columbia*, 697 A.2d 1249, 1252 (D.C.1997)). The plaintiff bears " 'the burden of establishing that the criminal act *was so foreseeable*

that a duty arises to guard against it.' " *Id.* (emphasis in original). In addition, " '[b]ecause of the extraordinary nature of criminal conduct, the law requires that the foreseeability of the risk be more precisely shown.' " *Potts, supra*, 697 A.2d at 1252 (quoting *Clement v. Peoples Drug Store*, 634 A.2d 425, 427 (D.C.1993)). If the intervening criminal act "can fairly be said to be that which could not have been reasonably anticipated, plaintiff may not look beyond the intervening act for his recovery." *District of Columbia v. Doe*, 524 A.2d 30, 32–33 (D.C.1987) (internal citation and quotation marks omitted).

Here, the combination of factors relied upon by appellant is insufficient to establish that appellees had increased awareness of the danger of the particular criminal act that underlies this litigation. Appellant presented evidence of only two specific crimes that occurred at the gas station prior to the assault against her. First, a police report indicates that an assault involving a handgun occurred on April 26, 1998, two years prior to the assault in this case. The officer who completed the form report indicated that the assault took place "in front of" the "customer area," leaving blank a box on the form that would have so indicated if the crime took place inside the gas station. Second, another report indicates that a theft occurred a few months prior to the attack upon appellant. This theft amounted to the snatching of cash and credit card receipts from a cigar box while the attending employee was in the restroom.[6] There was no evidence that

---

5. In *Viands*, the Municipal Court of Appeals of the District of Columbia held that a store owner has a duty to protect customers from foreseeable dangers while they are in the store and also while they are "using the exit doorway and the approach thereto[.]" *Viands v. Safeway Stores, Inc.*, 107 A.2d 118, 121 (D.C.1954).

6. Olu Ogundimu, one of the Apex employees who was working on the night of the robbery, was impeached at his deposition by statements that he made to an investigator. Ogundimu admitted that he told the investigator that in 2000, there were security cameras at the gas station but "those boys that were hanging around outside [the station] took

any offense in the nature of an assault had occurred previously inside the gas station.

We are not persuaded by appellant's contention that this case is governed by *Viands, supra,* 107 A.2d at 118. It is significant that *Viands* did not involve the criminal act of a third party and the court thus did not examine whether the plaintiff had made the sort of showing of foreseeability required here. In *Viands,* the plaintiff tripped over the delivery wagon of one of a multitude of boys who congregated regularly with their wagons on the sidewalk outside the store's entranceway. *Id.* at 119. There was no allegation that the boy's negligence amounted to criminal conduct; thus, the court had no occasion to apply a heightened foreseeability standard in determining whether the store owner had a duty of care.

We find guidance in cases which, unlike the one before us, involved the use of weapons. *See Potts, supra,* 697 A.2d at 1252 ("Our opinions have made clear the demanding nature of the requirement of 'precise' proof of a 'heightened showing of foreseeability' in the context of an intervening criminal act involving the discharge of weapons.") (citing *Bailey v. District of Columbia,* 668 A.2d 817, 819 (D.C.1995)). In *Clement, supra,* 634 A.2d at 425, the plaintiff's husband was shot and killed in the parking lot of the drug store where he worked. This court affirmed a directed verdict for the defendant drug store because "[t]here was no showing ... that [the drug store] employees or customers were more exposed to criminal victimization than others in the general population." *Id.* at 429. The plaintiff there showed that twenty-nine crimes were reported in the area around the drug store within the three years preceding her husband's

death. *Id.* This evidence also included reports of offenses at nearby stores, one of which involved a gun and one of which involved a knife. *Id.* It also included reports of six offenses that occurred in the very drug store where the victim worked, including "two 'snatches' of money out of cash registers, three apprehensions of shop lifters, and one assault upon a security guard." *Id.* However, we concluded that the evidence was insufficient, noting that none of the previous crimes at the drug store "involved weapons or any significant physical harm to the victims[.]" *Id.* Thus, we held that the evidence did not give the defendant a "heightened or increased awareness of the danger of this particular criminal act." *Id.*

Similarly, in *Bailey, supra,* 668 A.2d at 817, a plaintiff was held to have failed to meet the heightened foreseeability standard when she attempted to prove that the District of Columbia should have foreseen the criminal conduct which led to her injury. She was leaving her daughter's cheerleading competition when a gun fight began, and she was hit in the leg by a ricocheting bullet. *Id.* at 818–19. The event took place at Evans Junior High School, and was sponsored by the District's Department of Recreation. *Id.* at 818. The plaintiff sued the District for failing to provide adequate security precautions, asserting that the District "knew, and 'reasonably should have known of the high frequency of violence, and the reputation for violence'" at the school. *Id.* at 819. Her evidence of foreseeability included primarily affidavits of witnesses asserting that the school was located in a "high drug area" where shootings occurred. *Id.* at 820. In affirming the trial court's grant of summary judgment for the District, this court noted the absence of "evidence of

---

away the camera and broke it." Appellant asserts that the security camera at the gas station was stolen three months before the robbery.

any shooting incidents, assaults, or other gun-related violence at any Department [of Recreation] cheerleading competition or any other Department event held at [the school]." *Id.* at 820. Thus, the evidence was insufficient to show that the District had "a 'heightened' or 'increased' awareness" of the particular criminal act. *Id.* at 822.

In *Potts, supra,* a case in which the plaintiffs were shot as they were leaving a boxing match held at the Washington Convention Center ("WCC") and sponsored by Spencer Promotions, Inc., we also affirmed the grant of summary judgment to the defendants, noting that the plaintiffs had not proffered "evidence of any prior gun-related violence at any other event held at the WCC or promoted by Spencer Promotions[.]" 697 A.2d at 1252. Rather, the evidence consisted of the unsworn statement by the plaintiff's attorney that an expert witness would testify based on police reports of criminal activity in the area, " 'statistics regarding unreported crime, community characteristics, image and reputation of the location, environmental design of the building and the activity itself, i.e. boxing . . . as well as a review of all records, pleadings, deposition transcripts and interviews with plaintiffs.' " *Id.* at 1251. Thus, as in *Bailey* and *Clement,* the plaintiffs in *Potts* did not present "specific evidence bearing directly on the foreseeability of the shooting incident at issue [.]" *Id.* at 1252.

By way of contrast, the plaintiffs in *District of Columbia v. Doe* prevailed in meeting the heightened foreseeability standard. The plaintiffs in *Doe* were a ten-year-old girl who attended a District of Columbia public school and her next friend, her mother. 524 A.2d at 30–31. They alleged that the District had breached its duty to protect the girl against criminal activity. *Id.* at 31. We held that the plaintiffs had

adduced sufficient evidence to submit to the jury in order for it to determine "whether school officials were on notice of the danger to students from assaultive criminal conduct by intruders." *Id.* at 33–34. The evidence included:

> crimes against persons in and around the school—an arson in the school and a robbery on the school's playground; sexual assaults and other violent activity in the surrounding area; and deficient school security—the open rear gate, broken doors, malfunctioning intercom, and presence of adult males who freely roamed throughout the school.

*Id.* at 34. In *Beretta, supra,* 872 A.2d at 642—in which we described *Doe* as "[t]he high-water mark, as it were, of a showing of facts sufficient to create a duty to protect against [intervening criminal] conduct"—we compared the plaintiffs' showing in *Doe* with the lesser showings of foreseeability in *Clement, Bailey,* and *Potts.* In the three latter cases, liability was rejected as a matter of law because "foreseeability (hence duty) was not limited by any evidentiary reference to a precise location or class of persons." *Beretta, supra,* 872 A.2d at 642. *Doe* is clearly distinguishable from the instant case, and the evidence here, as in *Clement, Bailey,* and *Potts,* lacks the precision necessary to limit foreseeability of this particular act [robbery by force and violence] to this location [inside the gas station] and this class of persons [customers within the gas station].

First, in other invitor-invitee cases similar to this one, we have distinguished *Doe* based on the relationship between school officials and young children in that case. *See Clement, supra,* 634 A.2d at 429 ("Implicit in *Doe's* holding was the notion that particular care is required by school officials when the safety of young children is involved."); *see also Bailey, supra,* 668

A.2d at 821 (same). That difference aside, *Doe* is further distinguishable from this case because the failed security measures in *Doe*, including a broken gate and broken doors, were far more threatening. 524 A.2d at 34. Had those security measures worked, they might well have directly prevented the assailant from abducting his victim. Here, one could only speculate whether security cameras would have provided the deterrent effect necessary to prevent this crime. *Cf. Nigido v. First Nat'l Bank of Baltimore,* 264 Md. 702, 288 A.2d 127, 128 (1972) (affirming judgment sustaining bank's *demurrer* against declaration filed by bank customer shot in the course of bank robbery alleging that bank was negligent in that its camera and other protective devices were not functioning, bank failed to take proper precautions to guard building, and that unspecified history of bank robberies at location made robbery foreseeable). In addition, the elementary school in *Doe* was not open to the general public; therefore, the evidence that intruders roamed the halls of the school enhanced the foreseeability that a child could be abducted. 524 A.2d at 34. Here, the gas station was open to the public, making it unavoidably more difficult for the store owners and employees to separate potential robbers from ordinary customers. *Cf. Nigido, supra,* 288 A.2d at 128 ("It would be difficult, perhaps impossible, for guards [at a bank] to filter the robbers from the hundreds of daily visitors to the premises.").

Although the instant case does not concern a criminal act involving a firearm, as did *Clement, Bailey,* and *Potts,* the evidence here, as in those cases, fails to show that appellees had an increased awareness of the likelihood that this particular act would take place. The prior crimes at the gas station are remote from or dissimilar to the robbery in this case. As stated above, the one previous assault took place outside the gas station, two years prior to the robbery in this case. It also occurred one and one-half years before Apex purchased the gas station and nine months before Western Union signed its contract with Apex. Likewise, and as in *Clement, supra,* the previous "snatching" of money from the cigar box was a nonviolent offense that would not have placed appellees on notice that a customer would be assaulted during a robbery.

Appellant also argues that the attack upon her was foreseeable because of the "inherent danger of standing in line for an extended period at a location with a large sum of money," but cites no persuasive authority that a business owed her a heightened obligation under the circumstances present in this case. *See Nigido, supra.* This court expressed a different view in sustaining a verdict directed on opening statement in the somewhat similar situation of a customer injured as a result of a purse snatching in a supermarket in a high-crime area. *Cook v. Safeway Stores, Inc.,* 354 A.2d 507, 508–09 (D.C.1976) (rejecting argument that because store was located in high crime area and "similar incidents had occurred there and in the adjacent streets" such assaults upon customers were foreseeable and store had duty to provide guard service).

The record suggests that the assault against appellant was committed by a loiterer; however, there is no evidence that loiterers had ever caused or attempted to cause physical harm to customers of the gas station in the past. Therefore, appellant has not made a persuasive showing that the prior crimes or the presence of the loiterers gave appellees a "heightened or increased awareness of the danger of this particular criminal act." *Clement, supra,* 634 A.2d at 429. Thus, although one cannot help but feel sympathy for appellant, our controlling legal precedents do

not warrant requiring appellees to answer in damages for her unfortunate injuries.[7]

For the foregoing reasons, the trial court's grant of summary judgment in favor of appellees is affirmed.

*So ordered.*

7. In appropriate circumstances, a victim of crime may file a claim under the Victims of Violent Crime Compensation Act, D.C.Code § 4–501 *et seq.* (2001), for medical expenses, loss of income and other specified economic loss.